# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 13-cv-1526 (RJS)

LATIN AMERICA MUSIC COMPANY, INC., *A/K/A* LAMCO, *AND* ASOCIACIÓN DE COMPOSITORES Y EDITORES DE MUSICA LATINOAMERICANA, *A/K/A* ACEMLA,

Plaintiffs,

VERSUS

SPANISH BROADCASTING SYSTEM, INC.,

Defendant.

MEMORANDUM AND ORDER
September 23, 2015

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/23/2015

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Latin American Music Company ("LAMCO") and Asociación de Compositores y Editores de Musica Latinoamericana de Puerto Rico, Inc. ("ACEMLA") bring this action for copyright infringement against Defendant Spanish Broadcasting System, Inc. ("SBS"). Specifically, Plaintiffs allege that Defendant improperly broadcast songs on its Spanish-language radio stations without first obtaining licenses from Plaintiffs. Now before the Court is Defendant's motion for partial summary judgment on the grounds that Defendant had valid licenses – traceable to the original sources of the musical works – to play the eight songs at issue in this motion. For the reasons that follow, the Court finds that genuine issues of material fact exist regarding the licenses pertaining to each of the songs at issue and, therefore, denies Defendant's motion.

I. BACKGROUND

A. Facts

Plaintiff LAMCO is a music publisher that manages the copyrights for a number of Puerto Rican and foreign artists; Plaintiff ACEMLA, a subsidiary of LAMCO, is a

music performance licensing group.[1] (Pl. 56.1 Stmt. ¶¶ 1–2.) Defendant, in contrast, operates several radio stations throughout the United States, including the two at issue in this lawsuit – "La Zeta" in Puerto Rico and "Mega 97.9" in New York City. (*Id.* ¶¶ 3–4.)

In 1994, Plaintiffs and Defendant entered into a license agreement, pursuant to an informal settlement agreement, that permitted Defendant to broadcast songs licensed by Plaintiffs for public performance over a one-year term. (Doc. No. 24 ¶ 18.) Following the license agreement's expiration, Defendant declined to renew the agreement with Plaintiffs and, instead, began the process of obtaining broadcast licenses from Plaintiffs' competitors – Broadcast Music, Inc. ("BMI") and the American Society of Composers, Authors and Publishers ("ASCAP"). (*Id.* ¶ 19; Pl. 56.1 Stmt. ¶ 9.) BMI and ASCAP are voluntary membership associations that enter into agreements with music artists and publishers, whereby BMI and ASCAP obtain nonexclusive rights to license the public performance of the works in those artists' and publishers' catalogues. (Pl. 56.1 Stmt. ¶¶ 5–8.) BMI and ASCAP then grant broadcasters nonexclusive licenses to publicly perform the copyrighted works in BMI's and ASCAP's respective repertoires. (*Id.* ¶ 10.) Both BMI and ASCAP operate under decades-old consent decrees that govern the rates they may charge for licenses and are administered by judges in the Southern District of New York. BMI's Rate Court Judge is the Honorable Louis Stanton, and ASCAP's is the Honorable Denise Cote. (*Id.*) Of the eight songs at issue in Defendant's motion for partial summary judgment, BMI licenses six: *Soy Sensacional*, *Aguanile*, *Ausencia*, *Abuelita*, *Arroz Con Bacalao*, and *La Malanga*. The remaining two – *Aniversario* and *Tora Mata* – appear in the ASCAP repertoire.

B. Procedural History

Plaintiffs commenced this action on March 7, 2013. (Doc. No. 1.) On November 12, 2014, prior to the commencement of discovery, Defendant filed a motion for partial summary judgment with respect to eight of the thirteen songs at issue in this case. (Doc. No. 59; *see* Minute Entry for Proceedings dated Oct. 8, 2014.) Following the filing of Defendant's motion, Plaintiffs requested, and were granted, an opportunity to conduct limited discovery related to BMI's and ASCAP's alleged licenses before drafting their opposition to Defendant's motion. (Doc. Nos. 64–65.) The motion was fully briefed as of February 27, 2015. (Doc. No. 72.)

II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements. (Doc. No. 61 ("Def. 56.1 Stmt."); Doc. No. 71 ("Pl. 56.1 Stmt.").) Unless otherwise noted, where only one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. Facts not taken from the parties' Rule 56.1 Statements are provided for background purposes only and are drawn from the parties' briefs; the Court did not rely on such background information in deciding the instant motion. In resolving Defendant's motion (Doc. No. 59), the Court also considered Defendant's memorandum of law in support of its motion (Doc. No. 60 ("Mem.")), Plaintiffs' memorandum of law in opposition to the motion (Doc. No. 69 ("Opp'n")), Defendant's reply brief (Doc. No. 72 ("Reply")), and the documents submitted in support thereof (Doc. Nos. 62–63, 68, 73–74).

judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## III. DISCUSSION

The Copyright Act of 1976 provides that the owner of a copyright has the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) ("The fundamental copyright principles are clear. The owner of a copyright has the exclusive right to – or to license others to – . . . perform publicly . . . his copyrighted work."). A party who infringes the exclusive rights of a copyright owner is liable for damages pursuant to 17 U.S.C. § 504.

A copyright owner may, however, grant another the right to perform his or her work in the form of a license. There are two general types of licenses: (1) nonexclusive licenses, "which permit licensees to use the copyrighted material and may be granted to multiple licensees," and (2) exclusive licenses, "which grant to the licensee the exclusive right – superior even to copyright owners' rights – to use the copyrighted material in a manner as specified by the license agreement." *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007). Possession of a valid license, whether exclusive or nonexclusive, immunizes the licensee against later charges of infringement, provided that the licensee uses the copyright in the manner agreed upon in the license.

3

*Id.* at 100; *see also Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). Moreover, even where a licensee has operated outside the terms of its license, the copyright's owner may sue the licensee only for breach of contract, and not for copyright infringement. *Graham*, 144 F.3d at 236 (nonexclusive license); *see also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) (exclusive license).

Copyright law also provides for joint ownership of works and places restrictions on the types of licenses co-authors may grant. "Joint authorship entitles . . . coauthors to equal undivided interests in the whole work – in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made." *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998); *see also* 17. U.S.C. § 201(a). Therefore, a "co-owner may grant a *non-exclusive* license to use the work unilaterally, because his co-owners may also use the work or grant similar licenses to other users and because the non-exclusive license presumptively does not diminish the value of the copyright to the co-owners." *Davis*, 505 F.3d at 100–01. A co-owner acting alone, however, may not grant an *exclusive* license in any circumstance. *Id*. As a result, many individuals or entities may possess a nonexclusive license to a single work at the same time, since "[a] non-exclusive license conveys no ownership interest, and the holder of a nonexclusive license may not sue others for infringement." *Id*. at 101. Rather, that privilege is reserved for exclusive licensees. *See U.S. Naval Inst.*, 936 F.2d at 695 (citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.02 at 12–29 (1990) [hereinafter Nimmer].[2]

Where there are multiple conflicting "transfer[s] of copyright ownership" – which 17 U.S.C. § 101 defines to include "an assignment, mortgage, [or] exclusive license . . . but *not* [] a nonexclusive license" (emphasis added) – 17 U.S.C. § 205(d) lays out the test to determine priority of copyright ownership:

> As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice . . . , within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer. Otherwise the later transfer prevails if recorded first in such manner, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer.

Accordingly, unless a transferee promptly and properly records his assignment of ownership or grant of an exclusive license – thereby placing others on constructive notice of the transfer – the right of ownership in the relevant work belongs to the first party to

---

[2] The Third Amended Complaint in this matter lists LAMCO and ACEMLA as independent Plaintiffs and alleges that "Plaintiffs are . . . [each] the copyright owners or licensees of exclusive rights" for the songs at issue in this lawsuit. (Doc. No. 24 ¶ 22.) Although Defendant has not raised this issue in connection with the instant motion, it is not at all clear from the documents currently before the Court that ACEMLA has established an *exclusive* license or ownership interest in any of the works at issue.

4

record his or her transfer. 17 U.S.C. § 205(c)–(d); *see also* Nimmer § 10.07(A)(1)(a).

The Copyright Act provides a slightly different regime, however, for conflicts between transfers of ownership (including grants of an *exclusive* license) and transfers of *nonexclusive* licenses. *See* Nimmer § 10.07(B). Specifically,

> [a] nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if –
>
> (1) the license was taken before execution of the transfer; or
>
> (2) the license was taken in good faith before recordation of the transfer and without notice of it.

17 U.S.C. § 205(e). Therefore, a nonexclusive license is not extinguished by a subsequent transfer of copyright ownership, provided the license meets the statutory criteria. *See* Nimmer § 10.07(B).

A copyright registration certificate, issued upon application to the Copyright Office, constitutes *prima facie* evidence of both the validity of the copyright and of the facts stated in the certificate as long as the owner registered the work within five years of the work's first publication. 17 U.S.C. § 410(c). Even where a party's copyright is *prima facie* valid, however, the burden merely shifts to the opposing party to impeach or contradict the validity of the copyright and raise a triable issue of fact.

*PPX Enters., Inc. v. Transatlantic Corp.*, No. 92-cv-1749 (PKL), 1994 WL 364117, at *2 (S.D.N.Y. July 13, 1994).

### A. Defendant's Asserted Licenses

To assess whether there is a genuine dispute of material fact regarding the ownership and license rights of the parties, the Court must evaluate whether Defendant possessed a valid right or license, and thus a valid affirmative defense, for each of the eight songs at issue in this motion. Defendant argues that it possesses licenses stemming from agreements with BMI and ASCAP in effect at the time of the challenged performances. It then endeavors to trace BMI's and ASCAP's licenses back to the source of the musical work – through publishers, authors, transfers, and registrations – to support the validity of the BMI and ASCAP licenses.

### 1. BMI and ASCAP Licensing Agreements with Defendant

Plaintiffs argue at length that Defendant's licenses from BMI and ASCAP were executed in 2013, and therefore, cannot absolve Defendant of liability for any broadcasts prior to that date. (Opp'n at 2–3.) Specifically, Plaintiff argues that Defendant illegally broadcast two of the BMI songs – *Aguanile* on June 17, 2012, and *Arroz Con Bacalao* on January 24, 2012 – before it signed its license agreement with BMI on January 2, 2013. (*Id*.) Plaintiff further submits that Defendant illegally broadcast both of the ASCAP songs – *Aniversario* on August 11, 2013, and *Toro Mata* on August 8, 2013 – before it signed the ASCAP license agreement on September 5, 2013. (Pl. 56.1 Stmt. ¶¶ 13–14.) Defendant responds that its licenses from BMI and ASCAP, though signed in 2013,

5

carry effective terms beginning in 2010, as required by court order and, therefore, properly apply beginning in 2010. (Reply at 2–3.)

After consulting the materials submitted in support of this motion and available in the public record, the Court finds that Defendant received licenses from BMI and ASCAP beginning in 2010 and continuing through the relevant period.

a. BMI Rate Court Proceedings and License

Since 1941, BMI has operated subject to a consent decree with the United States that establishes, among other things, the mechanism through which music users, such as Defendant, may obtain licenses from BMI. (Reply Decl. of Richard A. Garza, dated Feb. 27, 2015 ("Garza Reply Decl."), Ex. 1.) The consent decree provides that any music user may make a written request for a license to BMI, thus obtaining an immediate license and initiating a rate negotiation process. (*Id.* at 7–9 (during the period of negotiation or litigation, the music user "shall have the right to use any, some or all of the compositions in [BMI's] repertory to which its application pertains" in exchange for a later-determined fee).) In the event that, following negotiations, the music user and BMI fail to reach an agreement as to rate, the consent decree provides that the music user may apply to the district court for a determination of a reasonable fee. (*Id.*)

A group of radio associations, collectively known as the Radio Music License Committee ("RMLC"), applied to BMI for license renewal in 2010. After the organizations were unable to privately negotiate a reasonable rate, the parties sought the intervention of the district court. On July 1, 2010, long before Defendant first played any of the songs at issue in this motion, Judge Stanton issued an interim fee order providing that the radio stations would pay a negotiated rate for licensing rights during the pendency of the RMLC litigation. (Garza Reply Decl. Ex. 2.) While not petitioners in that action, Defendant's stations were among the approximately 3,200 stations that agreed to be bound by the rates determined in the RMLC proceedings (the "BMI Bound Stations"), including any interim orders of the court. (*Id.* at 2–3 & Ex. 2B.) According to Judge Stanton's July 1, 2010 interim order, each owner of a BMI Bound Station "shall be deemed licensed and bound by the terms of [the court's interim] Order and the terms and conditions of the [BMI license]." (Garza Reply Decl. Ex. 2 at 3.)

Judge Stanton issued a final order in the radio station litigation on August 28, 2012, which set the rate that Defendant and other stations would pay BMI for the licenses they had enjoyed since 2010. (Garza Reply Decl. Ex. 3.) The order further approved proposed licensing agreements between BMI and the Bound Stations, which "cover[ed] the period January 1, 2010 through December 31, 2016 (the 'License Period'), and the final license fees and terms of BMI licenses for the period from January 1, 2010 through December 31, 2016." (*Id.* at 1.) The order also set a schedule for the execution of the contracts, but it provided that any stations failing to promptly return a signed copy of the agreement to BMI, including Defendant's stations, would "be nonetheless deemed to have elected to be licensed under the blanket license(s) as set forth in the 2010 License(s) as if the license(s) had been signed." (*Id.* at 2.)

The history of Defendant's and BMI's litigation in the rate court demonstrates that,

regardless of the execution date of its agreement, Defendant had obtained a license to perform the works in the BMI repertoire effective January 1, 2010 through December 31, 2016. Accordingly, Defendant had a license from BMI to broadcast *Aguanile* and *Arroz Con Bacalao* at the time of the alleged infringement in 2012.

### b. ASCAP Rate Court Proceedings and License

As with BMI, ASCAP operates pursuant to a consent decree, also executed in 1941, which provides that any music user may apply to ASCAP for a license. (Reply Decl. of Richard H. Reimer, dated Feb. 25, 2015 ("Reimer Reply Decl."), Ex. A.) Per the consent decree, a party seeking an ASCAP license must apply in writing; thereafter, ASCAP and the applicant will negotiate a licensing rate, applying to the district court for a determination of a reasonable fee if they are unable to agree. During the period of negotiation or litigation, however, the consent decree provides that the music user "shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains" in exchange for a later-determined fee. (*Id.* at 7.) On December 11, 2009, RMLC applied for an ASCAP license for thousands of radio stations, including Defendant's stations, and initiated rate negotiation procedures. (Reimer Reply Decl. ¶ 6 & Ex. B at 10.)

Following unsuccessful private negotiations, RMLC and ASCAP jointly petitioned Judge Cote to enter an interim fee order and determine a reasonable rate. (Reimer Reply Decl. Ex. B.) On March 25, 2010, Judge Cote entered an interim fee order setting temporary fees "subject to retroactive adjustment to January 1, 2010" for all those stations agreeing to be bound by the court's decisions (the "ASCAP Bound Stations"). (Reimer Reply Decl. Ex. C at 2.) The order further provided that each ASCAP Bound Station, including Defendant's stations, "shall be deemed licensed and bound by the terms of [the interim fee] Order and the terms and conditions of the [prior RMLC-ASCAP] License." (*Id.*)

Judge Cote issued a final order in the RMLC matter on January 30, 2012, which provided that the "ASCAP 2010 Radio Station License Agreement" would cover "the period [from] January 1, 2010 through December 31, 2016" and that each ASCAP Bound Station would "be deemed licensed under the ASCAP 2010 Radio Station License Agreement . . . and bound by the terms of [the court's] Order." (Reimer Reply Decl. Ex. E at 2.) Defendant and ASCAP complied with the court's deadlines to execute their license agreement and, pursuant to the court's order, agreed to a contract term of January 1, 2010 through December 31, 2016. (Decl. of Richard H. Reimer, dated November 12, 2014, Ex. A.) Thus, the documents pertaining to Defendant's and ASCAP's litigation in the rate court demonstrate that, regardless of the execution date of its licensing agreement, Defendant obtained a license to perform the works in the BMI repertoire from January 1, 2010 through December 31, 2016. Accordingly, Plaintiff's argument that Defendant broadcast *Aniversario* and *Toro Mata* before the term of its ASCAP license is without merit.

### 2. BMI and ASCAP Licenses from Publishers and Artists

Since the Court finds that Defendant held valid licenses from BMI and ASCAP during the relevant period, the Court's analysis of Defendant's claims ultimately

7

turns on whether BMI and ASCAP had valid licenses traceable to the original authors of the works. *Davis v. Blige*, 505 F.3d at 99–100. This inquiry necessarily entails establishing the identity of the appropriate original author or authors, whether those persons were the sole or joint rights holders, and whether the relevant licensing agreements executed with respect to each work were exclusive or nonexclusive.

Here, disputes over authorship defeat summary judgment with respect to several songs. For example, Defendant argues that *Soy Sensacional* was co-written by Larry Harlow Kahn and Jenaro Alvarez, Jr. (Mem. at 5–7), whereas Plaintiffs contend that the song was solely authored by an entirely different individual, Jenaro Alvarez Domenech (Opp'n at 4–5). Similarly, with respect to *Aguanile*, *Ausencia*, and *Abuelita*, Defendant asserts that it received a license originating from co-authors Willie Colon and Hector Perez (Mem. at 8–9), while Plaintiffs claim to have obtained a license from sole author Hector Perez (Opp'n at 6). Finally, Defendant claims that *Arroz Con Bacalao* was originally authored by Johnny Alvarez (Mem. at 17), but Plaintiffs claim the author was a different individual named Jenaro Alvarez Domenech (Opp'n at 7). Obviously, disputes as to the authorship of the works at issue precludes a determination as to which parties had the power to transfer ownership or licenses in these works. Accordingly, the Court cannot grant summary judgment in favor of Defendant on these songs.

As for the remaining songs – *La Malanga*, *Aniversario*, and *Toro Mata* – the parties agree to authorship but assert conflicting transfers of licensing rights. Unfortunately, neither party addresses whether the transfers pertained to exclusive licenses that must be recorded to prevail under 17 U.S.C. § 205(d) or nonexclusive licenses that prevail over later grants of exclusive licenses under certain circumstances.[3] Because the nature of the licenses is crucial to the legal analysis of Plaintiffs' claims and Defendant's affirmative defenses, the Court cannot grant summary judgment in favor of Defendant at this time.[4]

### B. Innocent Infringement Defense

Defendant maintains that, even if there are disputed issues of material fact that preclude summary judgment as to Defendant's affirmative defenses, it nevertheless qualifies as an innocent infringer entitled to reduced statutory damages. (Mem. at 20–22; *see also* 17 U.S.C. § 504(a) & (c)(1).) Pursuant to 17 U.S.C. § 504(c)(2), when an "infringer sustains the burden of proving . . . that [it] was not aware and had no reason to believe that [its conduct] constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." "[E]ven for an innocent defendant," however, "the court may still choose to award damages up to the [statutory]

---

[3] The parties similarly fail to characterize the licenses alleged with respect to *Soy Sensacional*, *Aguanile*, *Ausencia*, *Abuelita*, and *Arroz Con Bacalao*, presenting an alternative basis for the Court's denial of summary judgment for those songs.

[4] Plaintiffs raise a number of objections to the documents submitted in support of Defendant's motion, including allegations that documents are inadmissible hearsay or even forgeries. (*See* Opp'n at 5–6, 8, 12, 14, 16.) Since the Court finds that, even with the aid of its documents, Defendant cannot prevail on summary judgment, it does not address these evidentiary arguments, which can be addressed at a later date.

8

maximum amount" of $30,000. Nimmer § 14.04(B)(2)(a); *see* 17 U.S.C. § 504(c); Nimmer § 1308.

While a defendant may move for summary judgment with respect to an innocent infringement defense in an effort to limit the award of damages, *Jewelry 10, Inc. v. Elegance Trading Co.*, No. 88-cv-1320 (PNL), 1991 WL 144151, at *1 (S.D.N.Y. July 20, 1991), it is the defendant's burden to establish that its infringement was innocent, *D.C. Comics, Inc. v. Mini Gift Shop*, 912 F.2d 29, 35 (2d Cir. 1990). To demonstrate its innocence, an infringer must show (1) a subjective good faith belief in the innocence of its conduct that was (2) objectively reasonable under the circumstances. *See* Nimmer § 14.04(b)(2); *Childress v. Taylor*, 798 F. Supp. 981, 994 (S.D.N.Y. 1992). Thus "innocent" intent is more than just the absence of willful infringement. As the Second Circuit has stated:

> It is plain that "willfully" infringing and "innocent intent" are not the converse of one another. Thus, it is possible in the same action for a plaintiff not to be able to prove a defendant's willfulness, and, at the same time, for the defendant to be unable to show that it acted innocently.

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986).

Here, Defendant maintains that BMI's and ASCAP's websites listed the songs at issue in the repertoire of works covered by their licensing agreements and that Defendant reasonably relied on those websites to list the works Defendant had obtained the legal right to broadcast. (Def. 56.1 Stmt. ¶¶ 37, 50, 62, 77, 91, 99; *see also* Mem. at 21.) Plaintiffs concede that many of the songs at issue in this motion are *currently* listed on the relevant websites, but they note that Defendant's documentation does not indicate when the songs were added to the websites or whether the songs appeared on the websites at the time of Defendant's allegedly infringing broadcasts. (Pl. 56.1 Stmt. ¶¶ 37, 50, 62, 77, 99.) In fact, the record before the Court indicates that ASCAP's website omitted the listings for *Aniversario* and *Toro Mata* from its catalogue at the time of the initial briefing on this motion. (*Id.* ¶¶ 91, 99; Reimer Reply Decl. ¶¶ 13–15.)

Although evidence of the BMI and ASCAP website listings at the time of the alleged infringement is likely to go a long way towards establishing Defendant's innocent infringement defense with respect to damages, it would be difficult for the Court to conclude that Defendant had a subjective good faith belief in the innocence of its conduct before depositions. (Pl. 56.1 Stmt. ¶¶ 91, 99.) *See, e.g.*, *Jobete Music Co. v. Johnson Commc'ns, Inc.*, 285 F. Supp. 2d 1077, 1086–88 (S.D. Ohio 2003) (finding defendant was an innocent infringer where it sought out and relied on an album label clearly indicating that a song was within the BMI repertoire to which that defendant had performance rights). Moreover, at this stage of the proceedings, without the benefit of a fuller record, the Court cannot determine whether to exercise its discretion and limit damages to "a sum not less than $200." 17 U.S.C. § 504(c)(2). As a result, the Court finds that Defendant's motion for summary judgment on its innocent infringement defense is premature and must be denied, without prejudice to renewal after the completion of discovery.

9

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendant's motion is DENIED. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 59. IT IS FURTHER ORDERED that the parties shall submit a joint letter by October 2, 2015 regarding next steps, including what additional discovery, if any, is required in this matter.

SO ORDERED.

*[signature]*
RICHARD J. SULLIVAN
United States District Judge

Dated: September 23, 2015
    New York, New York

\*   \*   \*

Plaintiffs are represented by Kelly D. Talcott of the Law Offices of Kelly D. Talcott, 34 Grove Street, PO Box 43, Sea Cliff, New York 11579.

Defendant is represented by James C. Fitzpatrick and Meaghan C. Gragg of Hughes Hubbard & Reed, LLP, One Battery Park Plaza, New York, New York 10004-1482 and James G. Sammataro of Stroock & Stroock & Lavan, LLP, 200 South Biscayne Blvd. Suite 3100, Miami, Florida 33131.